UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

AJAB WOODSON,

                    Plaintiff,

            -against-

COUNTY OF NASSAU, NASSAU COUNTY
CORRECTIONAL CENTER, NASSAU COUNTY
SHERIFF'S DEPARTMENT, NASSAU COUNTY
SHERIFF ANTHONY J. LaROCCO, in his individual
and official capacities, CORRECTION OFFICER
JOHN DOES #1-10 (fictitiously named), in their
individual and official capacities,

                    Defendants.
-------------------------------------------------------------------X

Docket No.:

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff AJAB WOODSON, by his attorneys Horn Wright, LLP, complaining of Defendants COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, NASSAU COUNTY SHERIFF'S DEPARTMENT, NASSAU COUNTY SHERIFF ANTHONY J. LaROCCO, in his individual and official capacities, and CORRECTION OFFICER JOHN DOES #1-10 (fictitiously named), in their individual and official capacities, alleges as follows:

**PRELIMINARY STATEMENT**

1.     This is a civil rights action in which Plaintiff AJAB WOODSON ("WOODSON" or "Plaintiff") seeks relief from Defendants COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, NASSAU COUNTY SHERIFF'S DEPARTMENT, NASSAU COUNTY SHERIFF ANTHONY J. LaROCCO, in his individual and official capacities, and CORRECTION OFFICER JOHN DOES #1-10 (fictitiously named), in their individual and official capacities (hereinafter, collectively "Defendants"), committing acts under color of law and depriving Plaintiff of rights secured under 42 U.S.C. § 1983 grounded in rights secured to him

1

under the Eighth and Fourteenth Amendments to the Constitution of the United States and laws of the State of New York.

2.      Plaintiff alleges that Defendants engaged in unlawful conduct. Specifically, during the course of Plaintiff's pre-trial detention at the Nassau County Correctional Center, Plaintiff was subjected to inhumane conditions that pose unreasonable and substantial risks to his health. Plaintiff WOODSON was forced to live amidst filth, constant flooding due to leaks in the roof and plumbing, overflowing sewage, pervasive mold, rust, vermin, and lack of access to medical care.

3.      Plaintiff, while at the Nassau County Correctional Center, lacked access to medical treatment, clean drinking water, and safe food, as well as basic necessities such as sanitary and safe living dorms, and properly functioning sinks, toilets, and showers.

4.      Plaintiff seeks damages, both compensatory and punitive, award of costs, interest, attorney's fees, and such other and further relief as this Court deems just and equitable.

## JURISDICTION

5.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the Eighth and Fourteenth Amendments of the United States Constitution. Jurisdiction is conferred upon this Court by 42 U.S.C. § 1983 and by 28 U.S.C. §§ 1331 and 1343(3) and (4) of the aforementioned Constitutional provisions.

6.      Supplemental jurisdiction over Plaintiff's state law claims exists pursuant to 28 U.S.C. § 1367(a).

## VENUE

7.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) since all of the events and omissions giving rise to Plaintiff's claims occurred within the County of Nassau; the actual place of employment of the individually named Defendants and

2

CORRECTION OFFICER JOHN DOES #1-10 is within the County of Nassau in the Eastern District of New York; and the County of Nassau is within the jurisdiction of the Eastern District of New York. The events surrounding this lawsuit occurred in the County of Nassau, in the Eastern District of New York.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.      Plaintiff attempted to fulfill the requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997(e)(a), requiring detainees to exhaust available, administrative remedies prior to filing suit under 42 U.S.C. § 1983 alleging violations of their Constitutional rights but was denied access to the process and/or prevented from filing such.

## NOTICE OF CLAIM

9.      Plaintiff filed a timely Notice of Claim with the County of Nassau on or about April 24, 2024. More than 30 days have elapsed since the filing of the Notice of Claim, and adjustment or payment thereof has been neglected or refused.

## THE PARTIES

10.     Plaintiff AJAB WOODSON ("WOODSON" or "Plaintiff") is a resident of the County of Nassau. At all relevant times described herein, Plaintiff was a pretrial detainee in the custody and care of Defendants.

11.     Upon information and belief, at all relevant times described herein, Defendant COUNTY OF NASSAU ("COUNTY") was and continues to be a municipal corporation organized and existing by virtue of the laws of the State of New York.

12.     Upon information and belief, at all relevant times described herein, Defendant COUNTY, by its agents and/or employees, operated, maintained, and controlled the NASSAU COUNTY SHERIFF'S DEPARTMENT ("NCSD"), including the NASSAU COUNTY

3

CORRECTIONAL CENTER ("NCCC") and all Correction Officers thereof, and is responsible for providing a safe and secure environment for detainees in its custody.

13. Upon information and belief, at all relevant times described herein, Defendant NCSD, by its agents and/or employees, operated, maintained, and controlled the NCCC and all Correction Officers thereof, and is responsible for providing a safe and secure environment for detainees in its custody.

14. At all relevant times herein, NASSAU COUNTY SHERIFF ANTHONY J. LaROCCO ("LaROCCO") was and is the Sheriff of the County of Nassau, acting under color of state law, and is responsible for providing a safe and secure environment for detainees in his custody. LaROCCO is being sued in his individual and official capacities. Defendant LaROCCO is responsible for the day-to-day operations of NCCC. As Sheriff, he has the custody, control, and charge of the NCCC and its inmates. LaROCCO is legally responsible, in whole or in part, for the operation of the NCCC, for the conditions therein, and the health and safety of persons confined or incarcerated therein. As Sheriff, LaROCCO has final policy-making authority for all matters relating to the operation of NCCC, including final policy-making authority and ultimate responsibility for the custody, treatment, control, and care of all persons detained in NCCC. The individuals working at NCCC are Defendant LaROCCO's agents and employees.

15. Upon information and belief, at all relevant times described herein, Defendant CORRECTION OFFICER JOHN DOES #1-10 (fictitiously named) ("DOES"), are individuals and employees of COUNTY with an actual place of employment within the County of Nassau, State of New York, who are being sued in their individual and official capacities. At all relevant times described herein, DOES were acting under color of state law and within the scope of their employment as correction officers and/or supervisors employed by Defendant COUNTY, and

4

work under the supervision, direction, and/or control of their supervisors in the NCSD, NCCC, and LaROCCO. They are legally responsible, in whole or in part, for the operation of the NCCC, for the conditions therein, and the health and safety of persons confined or incarcerated therein.

## FACTUAL BACKGROUND

16.     NCCC has a history of violating minimum health and safety standards for correctional facilities in the State of New York[1]. In a 2011 letter to then Acting Sheriff Sposato, Thomas A. Beilein, Chairman of the State Commission of Correction, outlined a series of long-standing violations at the jail. Per the Commission, of the 27 violations cited by NYS, 14 violations remain, including poor maintenance of the shower units as well as not correcting sanitation violations cited over the past 27 months, Beilein stated that "[t]his is a . . . chronicle of widespread and persistent violations of state regulations," that the COUNTY should have established a plan to clean and maintain.

17.     Starting on or about January 26, 2024, Plaintiff was forced to live in squalid, unhygienic, and hazardous living conditions that pose a substantial and ongoing risk to his physical and mental health. Many of the individuals detained in NCCC have been housed in other correctional facilities as the result of either transfers or previous or subsequent incarcerations, and they describe the uninhabitable conditions at the NCCC as the worst conditions of any jail or prison they have known.  On information and belief, all of the conditions described herein have persisted regularly since at least 2011.

---

[1]     See      https://www.nytimes.com/2000/09/16/nyregion/14-month-federal-study-denounces-cruel-conditions-at-the-nassau-county-jail.html

18.    NCCC's plumbing problems have created an unsanitary environment for the individuals detained there by exposing them to constant flooding and human waste on a regular and ongoing basis.

19.    The poor plumbing causes the toilets and sinks, contained within each of the individual cells in the dorms, to constantly flood and/or leak.

20.    Similarly, the roof at the correctional facility is in such disrepair that it is constantly leaking. During any rainstorm, water seeps into the dorms through the ceiling and light fixtures, causing water to accumulate in the sleeping areas and common areas. This was particularly the case in Plaintiff's dorm where these problems seem to be the worst. In an attempt to alleviate some of these problems, NCCC staff would overhang plastic tarps on the ceilings in order to catch and divert water.

21.    On information, the roof was in such disrepair that on one occasion there was a partial roof collapse.

22.    Nearly every night, when the detainees are sleeping (and cannot make a plea for assistance), water and waste would accumulate in the cells and sometimes overflow onto the cell floors. The water accumulation would be even worse on nights and/or days when it rained.

23.    The common areas of the dorms would similarly get flooded as water seeped out from the cells, or from the poor plumbing in the showers or leaks from the roof.

24.    Detainees wake up daily to accumulated water and waste, causing them to regularly vomit, cough, and suffer from nausea and severe headaches due to the fumes. In Plaintiff's dorm, detainees are regularly forced to tread through water in their cells and common areas. Plaintiff and others would attempt to mop up the water, but at times the flooding was so bad that it was simply futile to contain the water or the stench.

25.     Plaintiff, as well other detainees, raised the plumbing and roof issues with corrections officials on many occasions. Nevertheless, the plumbing and roof issues were never fixed.

26.     The showers at NCCC are decrepit, coated in black mold, and reek of mildew. The faucets and pipes are rusted over and constantly leak.

27.     At times, sewage backs up out of the shower drains, and there is often standing water in the showers because the drains are frequently clogged.

28.     When Plaintiff and other NCCC detainees shower, they try to not touch anything in the showering area in an attempt to avoid contact with the mold, mildew, rust, and possible sewage.

29.     Routine exposure to these unsanitary conditions has given Plaintiff and, upon information, other detainees skin conditions.

30.     COUNTY, corrections officers, and medical staff in NCCC are well aware of the unsanitary conditions of the dorms.

31.     COUNTY, through NCSD, the County Executive, and the Legislature, has engaged in a pattern and practice of deliberate indifference to the inhumane and unconstitutional conditions at NCCC.

32.     COUNTY has systematically and deliberately ignored or failed to take reasonable measures to address the visibly deplorable and unconstitutional conditions at NCCC. As described in detail in this Complaint, the facilities are constantly flooded by either water or human waste, filled with rust and holes, the roof is in complete disrepair adding to leaks and water accumulation in many areas inside the facilities, and the tiles are detached and lifting off the floor. Areas of the

walls, ceilings, and showers are covered in black mold, and detainees are forced to live in and be exposed to each others' filth and waste.

33. COUNTY has also systematically and deliberately ignored and/or failed to take reasonable measures to address the complaints about the deplorable and unconstitutional conditions raised by the detainees in NCCC. For years, the men detained in NCCC have submitted grievances through NCCC's complaint procedures describing the conditions set forth in this Complaint and have sought medical treatment for their injuries arising from these conditions.

34. These uninhabitable and hazardous conditions are the product of decades of neglect and the refusal by COUNTY to adequately maintain NCCC and ensure that there are appropriate and humane conditions for its detainee population.

35. COUNTY knew or should have known that NCCC was not properly maintained, has been permitted to fall into total disrepair, and that this continued failure to address the problem has reached desperate proportions.

36. The foregoing policies, acts, inactions, omissions, and systematic failures are the official policies, practices, and customs of Defendant COUNTY. The foreseeable result of these policies, practices, and customs was the further deterioration of the already inhumane conditions at NCCC.

37. Defendant COUNTY was deliberately indifferent to the unconstitutional conditions at NCCC and established a policy, practice, and/or custom of approving and tolerating the unconstitutional conditions by refusing to remediate them.

38. Despite knowledge of such unlawful policies, practices, and/or customs, Defendant COUNTY's policy-making officials and officials with oversight responsibilities over NCCC have not taken steps to terminate or remediate these policies, practices, and/or customs, and instead have

supported, ratified, or implemented these policies, practices, and/or customs through their active encouragement or deliberate indifference to the effect of such policies, practices, and/or customs upon the Constitutional rights of persons in their care or custody.

39.     As a direct and proximate result of COUNTY's persistent and widespread practice and official policy of failing to provide for even the most necessary and urgent repairs of the facilities, or to even minimally address decades of overcrowding, the men detained in NCCC have been forced to live in inhumane conditions that deprive them of their Constitutional rights.

40.     On or about January 26, 2024, Plaintiff was incarcerated at NCCC, located at 100 Carman Avenue, East Meadow, New York (the "Subject Premises"), housed in dorm E1B.41.

41.     On or about January 26, 2024, Plaintiff was sitting at a table in the common area of the dorm. Unbeknownst to him, while he was sitting, water had accumulated beneath him due to the disrepair of the roof and the plumbing.

42.     On or about January 26, 2024, Plaintiff was caused to slip and fall due to the accumulated water, and sustain severe and permanent injuries.

43.     At the time of the fall, Plaintiff was wearing shoes provided to him by NCCC. Said shoes provided no traction, were the wrong size, and increased Plaintiff's risk of slipping and sustaining injuries.

44.     As Plaintiff fell, his right arm became lodged between the table and attached stool and, as a result, sustained a fracture.

45.     Following the incident, Plaintiff was visibly injured and calling for assistance; however, no correctional officers were present, and other detainees were forced to assist Plaintiff in getting up.

9

46.    Defendant DOES assigned to the areas where Plaintiff's injuries occurred were not present and/or nowhere to be found.

47.    Once Defendant DOES arrived, Plaintiff immediately complained that he was in pain and needed immediate medical attention.

48.    Defendants have a duty to provide competent medical and custodial care to their pre-trial detainees.

49.    After much complaining, Plaintiff was ultimately taken to the medical unit, where he was placed in the holding cell for at least an hour prior to receiving a medical examination.

50.    Following the examination at the medical unit, Plaintiff was provided with an ACE wrap and placed back in the holding cell until the following morning, when Plaintiff was taken to the hospital.

51.    At the hospital, Plaintiff underwent an MRI which revealed a broken arm with a three-centimeter gap between the bone fragments. Plaintiff was provided with an ill-fitting brace for his injuries.

52.    Plaintiff was then transported back to the medical unit of NCCC, and remained in the medical unit's holding cell for sixteen days.

53.    Plaintiff submitted numerous daily complaints regarding his injuries and the severe pain he was being forced to endure.

54.    Despite the complaints and seriousness of his injuries, Plaintiff was not provided with adequate medical treatment, ultimately rendering him unable to feed himself, brush his teeth, write, or pick items up.

55.    Twenty-two days after the incident, Plaintiff finally underwent surgery for the broken arm.

56.    As a result of the slip and fall, Plaintiff suffered a broken bone, nerve damage, atrophied muscles, psychological anguish, permanent injuries, and disabilities.

57.    Plaintiff is aware of other individuals who have experienced the same or similar circumstances, where certain areas within the facility are unfit for habitation or contain unnecessary hazards, resulting in injuries to numerous detainees.

58.    The injuries Plaintiff suffered were caused solely by the conduct of Defendants, and Plaintiff in no way contributed to or caused the injuries he suffered.

59.    Defendants' intentional, reckless, negligent or deliberately indifferent behavior caused Plaintiff conscious pain and suffering, permanent physical injuries, and emotional harm.

60.    Defendants were aware and knew and/or had reason to know of the substantial risk to Plaintiff, and individuals like Plaintiff, to his physical and mental health and safety. Despite this knowledge, Defendants disregarded said risk.

61.    Defendants were well aware of the inhumane, toxic, and dangerous conditions at NCCC but failed to take any measures to correct and/or repair same.

**COUNT I**
**DELIBERATE INDIFFERENCE TO PAST, CURRENT, AND ONGOING UNCONSTITUTIONAL CONDITIONS AT NCCC UNDER THE FOURTEENTH AMENDMENT**
*(Against All Defendants)*

62.    Plaintiff repeats, realleges, and reiterates each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

63.    The Due Process Clause of the Fourteenth Amendment affords pretrial detainees at least the same rights as those afforded convicted prisoners, if not greater rights. In light of the totality of the circumstances discussed in detail above, Defendants - acting under color of state law

- have subjected Plaintiff to conditions of confinement that expose Plaintiff to a substantial risk of serious physical and psychological harm and, as such, constitute unlawful punishment in violation of the Fourteenth Amendment.

64.    Defendants have subjected and continue to subject Plaintiff and other inmates to cruel and inhumane prison conditions that damaged them and which pose an unreasonable and unjustifiable risk of harm to their health, and have manifested and continue to manifest a pattern of deliberate indifference to this damage and risk of harm. The challenged conditions violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

65.    As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees.

**COUNT II**
**DELIBERATE INDIFFERENCE TO PAST, CURRENT, AND ONGOING UNCONSTITUTIONAL CONDITIONS AT NCCC UNDER THE EIGHTH AMENDMENT**
*(Against All Defendants)*

66.    Plaintiff repeats, realleges, and reiterates each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

12

67.     The Eighth Amendment to the United States Constitution requires that state actors take reasonable measures to guarantee the safety and well-being of inmates in their custody

68.     In light of the totality of the circumstances discussed above, Defendants - acting under color of state law - have subjected Plaintiff to inhumane conditions that have exposed and continue to expose Plaintiff and other inmates to a substantial risk of serious physical and psychological harm and, as such, constitute cruel and unlawful punishment in violation of the Eighth Amendment.

69.     Defendants possess the ability to remedy the hazardous conditions in question, but have willfully failed to do so. In fact, their actions have exacerbated the risk of harm or injury to the inmates. Defendants have failed to address the ongoing leaks, overflowing sewage, or the broken or lifting tiles, allowing these conditions to persist unchecked, thereby increasing the likelihood of injury.

70.     Furthermore, Defendants restrict inmates' access to mops and cleaning supplies, providing them only at their discretion, which further contributes to the hazardous environment. To add further insult to injury, despite being fully aware that the concrete and steel floors are consistently subject to flooding, have broken or missing tiles, and are a hazard, Defendants provided Plaintiff with ill-fitting, traction-less rubber shoes, which are prone to slipping and wholly inadequate for the dangerous conditions present.

71.     Defendants have subjected and continue to subject Plaintiff to cruel and inhumane prison conditions that damaged him and which pose an unreasonable and unjustifiable risk of harm to his health, and has manifested and continues to manifest a pattern of deliberate indifference to this damage and risk of harm. The challenged conditions violate the Eighth Amendment to the United States Constitution.

72.     As a result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees.

<u>**COUNT III**</u>
<u>**DENIAL AND FAILURE TO PROVIDE MEDICAL TREATMENT PURSUANT TO THE EIGHTH AND FOURTEENTH AMENDMENTS**</u>
(<u>***Against All Defendants***</u>)

73.     Plaintiff repeats, realleges, and reiterates each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

74.     Defendants had an affirmative duty to provide and administer health and medical services to Plaintiff and other NCCC pre-trial detainees.

75.     Defendants, as previously alleged, had a duty and obligation to provide Plaintiff and other NCCC pre-trial detainees reasonable and adequate health and medical services.

76.     Defendants, on information, had knowledge that the healthcare they provided and/or were responsible for providing to Plaintiff and other NCCC pre-trial detainees was deficient, inadequate, and incompetent.

77.     On information, the health and medical care provided by Defendants, or which they were responsible for providing, to Plaintiff failed to meet an acceptable standard of treatment and care in terms of modern medicine, technology, and current beliefs about human decency.

78.     On information, the health and medical care provided by Defendants, or which they were responsible for providing, created an excessive risk to Plaintiff, and the harm to which Plaintiff was exposed was sufficiently serious as to implicate his Constitutional rights.

79.     On information, Defendants knew that Plaintiff's medical condition constituted a serious need for immediate, competent, and adequate medical care and treatment.

80.     On information, Defendants knew of and ignored the aforesaid excessive risk to Plaintiff's health.

81.     The denial of adequate medical care as aforesaid created a condition of urgency, where pain, emotional distress, disability, permanent injury, or death was likely.

82.     Defendants' policies, practices, customs, actions, and failures to act constituted deliberate indifference to the serious medical needs of Plaintiff.

83.     Defendants were deliberately indifferent to the serious medical needs of Plaintiff.

84.     As a direct and proximate result of the foregoing, Plaintiff was subjected to great physical and emotional pain and suffering.

85.     Defendants' conduct demonstrated reckless and/or callous indifference to the federally protected rights of Plaintiff.

86.     As a direct and proximate result of the foregoing, Plaintiff was subjected to cruel and unusual punishment and denial of adequate housing, medical care, and treatment.

87.     As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental

15

anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees.

### COUNT IV
### MONELL
### (*Against Defendants COUNTY and LaROCCO*)

88.    Plaintiff repeats, realleges, and reiterates each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

89.    Upon information and belief, it was the custom, policy, and practice of COUNTY and LaROCCO to tolerate, condone, and encourage Constitutional violations, such as those alleged by Plaintiff above, by failing to properly punish, charge, reprimand, and investigate allegations and incidents of misconduct by corrections officers.

90.    Specifically, COUNTY and LaROCCO have a policy and practice of allowing and fostering inhumane living conditions and inmate upon inmate assaults by allowing and permitting their corrections officers to go unpunished and undisciplined when they  leave their posts despite knowing that such inhumane living conditions present a danger to NCCC pretrial detainees.

91.    In doing so, COUNTY and LaROCCO implement and accede to a policy and practice that deprives inmates of the baseline civilized requirements of life's necessities, that intentionally or recklessly subjects them to unnecessary and wanton infliction of pain, that imposes punishment that is cruel and unusual, and that violates inmates' rights under the Eighth and Fourteenth Amendments to the United States Constitution.

92.    Defendants COUNTY and LaROCCO's policy, custom, pattern, and practice of

such Eighth and Fourteenth Amendment violations has materialized in serious harm to NCCC pre-trial detainees repeatedly.

93.    For Plaintiff in particular, Defendants COUNTY and LaROCCO's illegal policy has caused him to incur physical, emotional, psychological, and pecuniary harms.

94.    Employees of COUNTY and LaROCCO, such as DOES in this action, were aware at all times alleged in this Complaint that their unconstitutional conduct would not be investigated or questioned, and that they would receive no reprimand or be punished for their conduct.

95.    Employees of COUNTY and LaROCCO, such as DOES in this action, were aware at all times alleged in this Complaint that their unconstitutional conduct would not be investigated or questioned, and that they would receive no reprimand or punishment for their conduct and, further, that they would be indemnified from civil liability regardless of the illegality or unconstitutionality of their actions.

96.    By failing to supervise, train, and reprimand such corrections officers, COUNTY and LaROCCO caused the injuries to Plaintiff through the actions and inactions of DOES.

97.    By maintaining a *de facto* policy of automatic indemnification, COUNTY and LaROCCO further caused the injuries to Plaintiff through the actions and inactions of DOES.

98.    Upon information and belief, this custom, policy, and practice of COUNTY and LaROCCO to ignore complaints and/or widespread allegations of inhumane living conditions, created an environment where foreseeable Constitutional violations by the corrections officers were rampant, including the violations of Plaintiff's Constitutional rights by DOES.

99.    COUNTY and LaROCCO's failure to take action against DOES involved in this incident and in other similar incidents was part of a custom, practice, and procedure of neglect and deliberate indifference that directly caused the injuries to Plaintiff.

100.    As authorized representatives of Defendants COUNTY and LaROCCO, the corrections officers' conduct constituted a custom, policy, and practice which renders Defendants COUNTY and LaROCCO liable to Plaintiff as a "Person" acting under the color of state law.

101.    These customs, policies, and practices which were enforced by Defendants COUNTY and LaROCCO were the moving force, proximate cause, or affirmative link behind the conduct causing Plaintiff's injuries.

102.    Had COUNTY and/or LaROCCO investigated serious complaints of inhuman living conditions and/or corrections officers leaving their posts and/or widespread allegations of same prior to February 18, 2024, DOES would not have been in a position to violate Plaintiff's Constitutional rights.

103.    COUNTY and LaROCCO` are therefore liable for violations of Plaintiff's Constitutional rights as caused by DOES, as described in more detail in the foregoing paragraphs; and Plaintiff has suffered damages therefrom.

104.    That, by virtue of COUNTY, LaROCCO, and other NCCC Supervisors' failure and refusal to adequately investigate DOES' actions, acquiescence in DOES' conduct, failure to take any remedial action against DOES, allowing DOES to remain employed as officers with NCCC, gross negligence in their supervision of DOES, and deliberate indifference to the rights of others by failing to act on information that Constitutional rights were being violated by DOES, Defendants COUNTY and LaROCCO, which employed these corrections officers and policymakers during the relevant time period, exhibited a *de facto* custom, policy, or practice of unconstitutional conduct sufficient for the imposition of municipal liability under *Monell v. Dept. of Social Services*, 436 US. 658 (1978).

105. As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00) plus attorney's fees.

## COUNT V
## NEGLIGENCE
### *Against All Defendants*

106. Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint marked and numbered previously with the same force and effect as if more fully set forth a length herein.

107. At all times herein mentioned, it was the duty of Defendants to maintain the Subject Premises in a safe and proper condition so as to provide for the safety of those lawfully making use thereof.

108. The above mentioned occurrence, and the results thereof, were caused wholly and solely by the negligence of Defendants, their agents, servants, licensees, contractors, subcontractors, employees, and other affiliate agencies and departments, and those acting under their direction, behest, permission, and control in the ownership, operation, designing, creating, managing, maintenance, contracting, subcontracting, supervision, authorizing use, and control of the Subject Premises; in affirmatively creating the defect; in failing to properly maintain the Subject Premises; in allowing the Subject Premises to become obstructed, accumulate excessive amounts of water, deteriorate, and/or be in a state of disrepair and/or improperly repaired; in failing

to inspect said Subject Premises; in causing, permitting, and/or allowing a trap, hazard, and nuisance to be and exist for an excessive and unreasonable period of time, despite actual and constructive notice; in failing to take any necessary steps to alleviate said condition; in failing to undertake proper and/or adequate safety studies and/or surveys; in failing to properly repair said Subject Premises area before authorizing its use; in failing to erect barricades, or otherwise restrict use of aforesaid area to prevent a hazard, trap, and nuisance from endangering the detainees and, more particularly, Plaintiff herein; in failing to warn the detainees and, more particularly, Plaintiff herein, of the subject hazard, trap, and nuisance; in permitting and allowing the aforesaid conditions to exist on the Subject Premises; in failing to avoid the aforesaid accident which was foreseeable; in failing to properly maintain the pipes at the Subject Premises; in failing to ensure there was proper drainage for the Subject Premises; and in being otherwise negligent, careless, reckless, and grossly negligent at the Subject Premises.

109.    That no negligence on the part of Plaintiff contributed to the occurrence alleged herein in any manner whatsoever.

110.    That as a result of the foregoing, Plaintiff was caused to sustain serious injuries and to have suffered pain, shock, and mental anguish; that these injuries and their effects will be permanent; and as a result of said injuries, Plaintiff has been caused to incur, and will continue to incur, expenses for medical care and attention; and, as a further result, Plaintiff was, and will continue to be, rendered unable to perform Plaintiff's normal activities and duties and has sustained a resultant loss therefrom.

111.    As a proximate result of Defendants' negligent actions, Plaintiff was caused to sustain bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages,

has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00).

**JURY DEMAND**

112.   Plaintiff demands a Trial by Jury of all causes of action so triable.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff AJAB WOODSON respectfully requests judgment against Defendants COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, NASSAU COUNTY SHERIFF'S DEPARTMENT, NASSAU COUNTY SHERIFF ANTHONY J. LAROCCO, in his individual and official capacities, and CORRECTIONS OFFICER JOHN DOES #1-10 (fictitiously named), in their individual and official capacities as follows:

A.     Under the First Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees;

B.     Under the Second Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees;

C.     Under the Third Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees;

D.     Under the Fourth Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00), plus attorney's fees;

E.     Under the Fifth Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00);

F.     Costs and disbursements of this matter; and

G.      Such other and further relief as the Court deems just and proper.

Dated: Garden City, New York
       April 14, 2025

**HORN WRIGHT, LLP**
*Attorneys for Plaintiff, Ajab Woodson*

By:    */s/Pablo A. Fernandez*

Pablo A. Fernandez
400 Garden City Plaza, Suite 500
Garden City, New York 11530
Tel: 516.355.9696
paf@hornwright.com

22